## LEVERETT agt. BULLIS

Hudson Leverett Adm$^r$ to the Estate of Bezaliel Payton deced. plaint. ag$^t$ Phillip Bullis & Judith his wife Def$^t$ in an action of trespass for illegally entring into & keeping possession of a Shop in Boston standing upon the Land belonging to the afores$^d$ Estate whereby the

plaint. is greatly damnified with all other due damages &c. . . . The Jury . . . found for the plaint. possession of the Shop Sued for and three pounds mony damage & costs of Court. The Def$^t$ appeal$^d$ from this Judgem$^t$ unto the next Court of Assistants and himselfe principall in Sixty pounds, Leonard Dowden & Benj$^n$ Davis Sureties in thirty pounds apeice were respectiuely bound . . . for the prosecution thereof unto Effect.

[ The facts of this case, so far as they can be gathered from the papers (S. F. 1753), are as follows: Payton made a contract to buy the land in question from Thomas Lake, took possession, and made outlays in building a house, "a very good one," deposed Henry Lamprey, who later occupied it, "with a Stack of Chimneys in the Middle glass Windows belonging to every Room of the House & a Wharffe before the Door" (S. F. 1753.6). But he never paid Lake the full price or took legal title. When Payton died, leaving a widow Mary and young children, this piece of property was inventoried as part of his estate. The widow rented most of the house to Lamprey for 12$l$ per annum, retaining two rooms for her own use. Late in 1651 or early in 1652 she married William Paddy, to whom, for two years thereafter, Lamprey paid his rent; which was equivalent to an entry into possession by Paddy. By his common law right as husband Paddy also took over his wife's personal property, including her share of her first husband's estate. He paid Payton's children a sum which perhaps covered their share of their father's estate. By English common law Paddy was not entitled to his wife's land, but he might enjoy the rents of it during their marriage and after her death if she had borne him a child (tenure by curtesy). John Hull the mintmaster asserted (S. F. 1753.5) that William Paddy was a man filled with "the Spirit of justice Love & Mercy" (he is named "Blessed William Paddy" on his gravestone), who went to considerable expense in bringing up the Payton children as his own. The defendant contends that the land might properly have been taken over by Paddy in the informal adjustment of family affairs. In 1655, legal title to the land was conveyed by Lake to Paddy; this deed was not recorded until 1677. In the meantime Paddy had died, leaving Mary a widow once more, and providing liberally by will for his Payton step-children as well as for his own full-grown children by a former marriage. The Paddy children, as his heirs, gave a lease of the land and buildings to Philip Bullis, the defendant. Now, many years later, Bullis is sued by the executor of Payton on the theory that the land was part of the Payton estate, so that Bullis' lease from the Paddy children was worthless.

Bullis defends himself (see his Reasons of Appeal, S. F. 1753.4, signed with his mark) by defending the Paddy title. His first argument is that Paddy's possession in 1651 gave him a good title. He relies on the statute of 1657 (General Laws and Liberties of the Colony, 1672 edition, title "Possession"), which states that any person who occupied real estate in his own right in fee simple before the statute of 19 October, 1652 on Inheritances, and retained possession thereof for five years from 20 May, 1657, could, by recording his claim within five years of the last date, "for ever after enjoy the same." Nothing is said to show that Paddy or his heirs recorded their claim; and Bullis delicately evades the point. But he produced a witness to prove that Paddy in 1651, before he married the widow Payton, discharged unpaid builders' accounts for the house (S. F. 1753.12), and contended that this payment was made because Paddy already regarded the house as his own. Secondly, Bullis argues that Payton never had legal title, since his contract to purchase from Lake gave no title.[1] Thirdly, Bullis relies on Paddy's legal title under the deed of 1655 from Lake. He contends the failure to record this deed for twenty years is immaterial since Lake did not remain in possession, so that there was no danger that the deed would be used to defraud Lake's creditors.[2] Fourthly, he declares that the inclusion of the land in the Payton inventory is an error, and it is also included in the Paddy inventory. Finally, he urges the justice of the situation, in that Paddy had paid out large sums for the benefit of the Payton children and bequeathed to them legacies much exceeding the value of the land, besides paying Payton's debts, the purchase price of the land, and a considerable part of the cost of building the house.

It is hard to see how the plaintiff had any case even if all Bullis' defenses be rejected. If Payton owned the land, title would descend to his heirs and not to his administrator, Leverett, who was suing. The only proper right of action was in the Payton children. The Court of Assistants (Records, i. 113) reversed the former judgment and assessed 34s 10d costs on Leverett.]

---

[1] In the English Court of Chancery this contract would have given Payton an equitable interest in the land which would have descended to the Payton children, and have enabled them to obtain legal title on completing the payment of the purchase price. Bullis does not discuss this possibility, and perhaps this equitable doctrine was ignored in the Colony.

[2] The existence of fraud on creditors was a strong motive for the introduction of the recording system; see the preamble to title "Conveyances, Deeds and Writings" in the General Laws and Liberties of 1672.